Filed 10/21/25  In re J.B. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | B342543<br><br>(Los Angeles County Super. Ct. No. 20LJJP00374F) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>E.B.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jennifer Baronoff, Juvenile Court Referee.  Dismissed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kelly G. Emling, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Father E.B. appeals from the juvenile court's jurisdiction findings and orders made pursuant to Welfare and Institutions Code section 342 concerning his son, J.B., and its orders regarding J.B.'s petition filed pursuant to section 388.[1]  The sole issue raised on appeal is whether the juvenile court and Los Angeles County Department of Children and Family Services (DCFS) complied with their obligations under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) and related California law.  We conclude father's appeal is not justiciable and dismiss the appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

Father and mother are the parents of J.B., born in May 2017.  Mother is not a party to this appeal.

In July 2023, mother was arrested after she allegedly struck and bit J.B.'s older half brother.  The juvenile court ordered J.B. and his twin half siblings detained from mother.  J.B. remained in the care of father, while his half siblings were placed with father's sister, paternal aunt S.B.

DCFS filed a petition pursuant to section 300 alleging that mother physically abused J.B.'s half siblings and father failed to protect J.B.  At the jurisdiction and disposition hearing, the juvenile court ordered father struck from the petition.  It ordered that J.B. remain released to father and subject to the jurisdiction

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

of the court and ordered family maintenance services. The court also ordered no corporal punishment and random, on-demand drug testing for father.

In March 2024, DCFS informed the court that father had not completed drug testing and had punished J.B. by hitting him on the hands and with a belt. At a review hearing, the juvenile court instructed father to comply with the case plan and admonished him not to physically discipline J.B.

In May 2024, a social worker observed a cigarette burn mark on J.B.'s arm. Father and J.B. claimed that J.B. had run into father while father was smoking. J.B. appeared nervous and did not provide further information. DCFS was concerned that the burn was intentional and that father had failed to seek medical care for J.B.

In June 2024, J.B. filed a request to change court order pursuant to section 388. The request sought J.B.'s removal from father based on father's alleged physical abuse. The court detained J.B. from father. DCFS filed a subsequent dependency petition pursuant to section 342, alleging that father medically neglected J.B. by failing to get appropriate treatment for the burn.

In October 2024, the juvenile court held a hearing on the petitions filed pursuant to sections 342 and 388. The court found the burn was non-accidental. It sustained DCFS's section 342 petition and granted J.B.'s section 388 petition. The court ordered random drug testing, parenting courses, and monitored visitation.

Father timely appealed.

***Facts Pertaining to ICWA***

In the July 2023 detention report, DCFS informed the court that father, mother, and paternal aunt S.B. had stated they had no reason to believe J.B. had Native American ancestry. Mother and father also filed ICWA-020 forms indicating that neither had Native American ancestry.

At the initial hearing, the court found it had no reason to believe ICWA applied as to father but deferred the determination of ICWA status for mother's appearance. The court ordered DCFS to interview all known relatives.

At mother's arraignment hearing, mother indicated she may have Blackfeet and Cherokee ancestry on her maternal side. The trial court instructed DCFS to speak with mother and maternal grandmother. It stated that "it looks very likely that the Blackfoot and Cherokee tribes should be noticed on this case."

In the August 2023 jurisdiction and disposition report, DCFS stated ICWA does or may apply and "eligibility is pending." A DCFS investigator had interviewed mother regarding Native American ancestry. Mother had again "reported possible 'Blackfeet and Cherokee' ancestry" and told the investigator to speak with maternal grandmother. She also provided the maternal grandfather's name. Maternal grandmother had reported that her mother's father, maternal great-great-grandfather, had possible Blackfeet ancestry. She denied ancestry from any Cherokee tribe. She provided the names of her parents (maternal great-grandparents) and of a maternal great-great-grandfather, all of whom were deceased. She stated no one else would have any information. DCFS sent inquiry and information letters to the Blackfeet tribe identifying

4

the parents, maternal grandparents, and two maternal great-grandparents.

The DCFS investigator spoke with father and paternal aunt again in August 2023. Both denied knowledge of Native American ancestry. Neither identified additional family members for DCFS to interview.

At the disposition hearing, the juvenile court observed there had not yet been a response from the Blackfeet tribe and set a further progress hearing concerning ICWA. In a last minute information, DCFS reported that it had yet to receive a response from the Blackfeet tribe. At the progress hearing, the court instructed DCFS "to make efforts to contact the Blackfeet tribe via email, fax, and phone" and stated that DCFS "should probably notice Cherokee as well just to be safe."

In a status report filed in March 2024, DCFS asserted that ICWA did not apply. It reported that, in January 2024, father again stated he had no reason to believe the children had Native American ancestry. A social worker had contacted the Blackfeet tribe "to inquire as to the status of ICWA" and "noticed the Cherokee Tribe to inquire as to the status of ICWA," but had received responses from neither.

In a May 2024 interim review report, DCFS again stated ICWA did not apply, citing prior statements from mother, father, and paternal aunt S.B. that they had no reason to believe the children had Native American ancestry. DCFS also stated mother and father had not provided any new information pertaining to Native American ancestry. The report made no mention of mother's claim of Blackfeet and Cherokee ancestry or DCFS's outreach to those tribes.

A service log filed in May 2024 reflected a telephone call between a social worker and paternal aunt S.B. from March 2024, during which paternal aunt stated that she believed the paternal great-grandmother was "Red Foot Indian and white."[2] She provided names for paternal grandmother and the paternal great-grandmother who she believed had "Red Foot" ancestry. She did not have the dates of birth for either and stated "[t]here is no one else from the family who has any further information." She stated paternal grandmother was not registered with a tribe but did not know whether the paternal great-grandmother was registered. She also provided paternal grandfather's address.

In the July 2024 jurisdiction and disposition report, DCFS detailed the further ICWA inquiries it had made. Paternal aunt S.B. reported she believed her family may have Cherokee ancestry through the paternal great-grandmother but could not provide names or dates of birth. Maternal aunt denied knowledge of Native American ancestry. Maternal grandmother stated that the maternal great-grandfather's family was from the "Blackfoot" tribe, but she had already provided DCFS all the information she had regarding Native American ancestry and had no relatives who could provide additional information. Father again denied knowledge of Native American ancestry on his or mother's sides of the family.

DCFS stated it would "continue to contact the Blackfeet and Cherokee tribes noticed. If there is still no response by 07/12/24, the Department will complete a new ICWA inquiry as to those tribes."

In a last minute information filed in August 2024, DCFS reported that a DCFS investigator had contacted the Blackfeet

---

[2]     There is no federally recognized "Red Foot" tribe.

tribe, which instructed the investigator to resend the inquiry. The investigator did so on August 15, 2024.

In another last minute information filed in October 2024, DCFS reported it had received letters from the Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians stating that J.B. was not eligible for registration with their tribes. DCFS was awaiting responses from the Cherokee Nation and the Blackfeet tribe.

In a case plan filed October 2024, DCFS indicated that the applicability of ICWA was pending.[3]

## DISCUSSION

Father contends insubstantial evidence supports the juvenile court's finding that ICWA did not apply to J.B. He argues that there is no indication in the record that DCFS asked certain known family members, such as the paternal and maternal grandfathers, about Native American ancestry. He further argues that, after learning of potential Native American ancestry on both sides of the family, DCFS failed to contact extended family members and others who may have information. He also contends that it is impossible to know whether the inquiries DCFS sent to the Cherokee tribes were adequate because they were not in the record.

DCFS seeks dismissal of this action because the sole issue raised is whether DCFS and the juvenile court erred with respect to the duty of inquiry pursuant to ICWA, and that duty is

---

[3] DCFS asked this court to take judicial notice of a minute order, dated August 7, 2025, which stated that a permanency review hearing was set for August 21, 2025. We decline to consider this evidence. Even if we did, it would not impact the outcome of this appeal.

ongoing. DCFS therefore argues that the appeal is premature and father's arguments are not justiciable. We agree with DCFS.

## I. ICWA Inquiry and Notice

"Section 224.2 codifies and expands on ICWA's duty of inquiry to determine whether a child is an Indian child."[4] (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1131.) An " 'Indian child' " is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (a).)

Section 224.2, subdivision (a), provides that both the juvenile court and child welfare agency have an "affirmative and continuing duty" to inquire whether a child is or may be an Indian child, beginning with the initial contact. Under section 224.2, subdivision (b), if a child is placed in the agency's temporary custody, the agency must inquire whether the child is or may be an Indian child, by asking a nonexclusive group that includes the child, the parents, and extended family members.

Under section 224.2, subdivision (e), if the juvenile court or social worker has reason to believe an Indian child is involved in the proceeding, but does not have enough information to determine there is a reason to know the child is an Indian child, the court or the social worker must make further inquiry, as soon as practicable. "[R]eason to believe" means the court or social worker has information "suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).)

---

[4] Section 224 et seq., is the California Indian Child Welfare Act.

8

"Further inquiry" includes actions such as "[i]nterviewing the parents, Indian custodian, and extended family members" to gather information that would be necessary to provide notice to any relevant tribes. (§§ 224.2, subd. (e)(2)(A), 224.3, subd. (a)(5).) That information includes "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment, membership, or citizenship information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C).) Further inquiry also includes contacting the "tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).)

There is "reason to know" a child is an Indian child when, among other things, a person having an interest in the child informs the court the child is an Indian child. (§ 224.2, subd. (d).) Formal notice to a tribe or tribes is required only when there is a reason to know the child is an Indian child. (§§ 224.2, subd. (f), 224.3, subd. (a).) An Indian tribe's determination that a child is or is not a member, or eligible for membership in the tribe, is conclusive. (§ 224.2, subd. (h).)

Under section 224.2, subdivision (i)(2), if "the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] . . . does not apply to

9

the proceedings, subject to reversal based on sufficiency of the evidence."

## II. Father's Appeal Is Not Justiciable

"A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' [Citation.]" (*In re D.P.* (2023) 14 Cal.5th 266, 276.) A case is moot where the court can grant no effective relief. (*Ibid.*) "For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*Ibid.*)

Father contends that the adequacy of DCFS's and the juvenile court's ICWA inquiry is cognizable on appeal, citing *In re Isaiah W.* (2016) 1 Cal.5th 1, 10, and other cases involving the termination of parental rights. In *Isaiah W.*, the Supreme Court held a parent who did not file a timely appeal from a juvenile court order that included a finding of ICWA's inapplicability may nevertheless challenge such a finding by appealing from a subsequent order terminating parental rights. (*Isaiah W.*, at p. 6.) The Supreme Court explained the juvenile court has "a *continuing* duty" to inquire whether the child before it is an Indian "in all dependency proceedings" and that an order terminating parental rights "was necessarily premised on a *current* finding by the juvenile court that it had no reason to know [the child] was an Indian child and thus ICWA notice was not required." (*Id.* at p. 10.)

10

This case involves an appeal from the juvenile court's orders on petitions filed pursuant to sections 342 and 388, which are not necessarily premised on a current finding of ICWA inapplicability. As father concedes, the juvenile court's October 2024 orders did not address ICWA. The only finding of ICWA inapplicability father identifies is the court's statement at a July 2023 hearing that it did not have reason to know ICWA applied as to father. However, the court deferred determination of J.B.'s ICWA status for mother's appearance. Since learning of the child's possible Native American ancestry, the juvenile court instructed DCFS to follow up on inquiries sent to the Blackfeet tribe and advised that notice should be provided to the Cherokee tribes. At the time the court issued the orders from which father appeals, responses to DCFS's inquiries were still outstanding from the Blackfeet tribe and one of the Cherokee tribes.

Although DCFS asserted in two reports that ICWA did not apply, subsequent reports DCFS filed with the juvenile court reflect its further inquiry efforts and the case plan it filed in October 2024 stated that the question of ICWA applicability remained pending. Thus, the record does not indicate that DCFS or the juvenile court understood that their inquiry obligations had been satisfied.

Father points out that there is no evidence that DCFS asked certain known family members, including the paternal and maternal grandfathers, about possible Native American ancestry. Further, the adequacy of the information provided in the inquiries to the Cherokee tribes is unclear. However, "all we could order in resolving this appeal is that [DCFS] and [the] juvenile court fulfill their inquiry and notice obligations under ICWA and related California law. Because that is what [DCFS]

11

is already doing, and because we are not in a position to micromanage that process in *this* appeal (detailing, for instance, all those who must be interviewed, what they must be asked, and what must be included in any notice to tribes that is required), there is no effective relief we can now provide.  The juvenile court must direct that process, at least in the first instance.  This appeal is moot."  (*In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639.)

## DISPOSITION

The appeal is dismissed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.

12